UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

——————————————————— x

CHAO LU, Individually and on Behalf of All
Others Similarly Situated,

                     Plaintiff,

    vs.

JUMEI INTERNATIONAL HOLDING
LIMITED, LEO OU CHEN, YUSEN DAI,
MONA MENG GAO, YUNSHENG ZHENG,
STEVE YUE JI, KEYI CHEN, GOLDMAN
SACHS (ASIA) L.L.C., CREDIT SUISSE
SECURITIES (USA) LLC, J.P. MORGAN
SECURITIES LLC, CHINA RENAISSANCE
SECURITIES (HONG KONG) LIMITED,
PIPER JAFFRAY & CO. and
OPPENHEIMER & CO. INC.,

                     Defendants.

——————————————————— x

Civil Action No. 14-cv-9826

CLASS ACTION

COMPLAINT FOR VIOLATION OF THE
FEDERAL SECURITIES LAWS

DEMAND FOR JURY TRIAL

Plaintiff Chao Lu ("plaintiff") alleges the following based upon the investigation of plaintiff's counsel, which included a review of U.S. Securities and Exchange Commission ("SEC") filings by Jumei International Holding Limited ("Jumei" or the "Company"), as well as regulatory filings and reports, securities analyst reports and advisories about the Company, press releases and other public statements issued by the Company, and media reports about the Company, and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a securities class action on behalf of all purchasers of the American Depository Shares ("ADSs") of Jumei pursuant and/or traceable to the Registration Statement issued in connection with Jumei's May 16, 2014 initial public stock offering (the "IPO"), seeking to pursue remedies under the Securities Act of 1933 (the "Securities Act").

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to §§11 and 15 of the Securities Act [15 U.S.C. §§77k and 77o].  This Court has jurisdiction over this action pursuant to §22 of the Securities Act [15 U.S.C. §77v] and 28 U.S.C. §1331.

3.      Venue is properly laid in this District pursuant to §22 of the Securities Act and 28 U.S.C. §1391(b).  The acts and conduct complained of herein occurred in substantial part in this District.  Following the IPO, Jumei ADSs trade on the New York Stock Exchange ("NYSE") and The Bank of New York Mellon was appointed by Jumei as depositary bank for its ADSs program, both of which are located in this District.  Jumei has also appointed the Law Debenture Corporate Services Inc., located in this District, as its agent of service.  The underwriting agreement in connection with the IPO provides that all parties agreed that the transaction documents are governed by the laws of New York and that the Company irrevocably submitted

to personal jurisdiction for these claims in the U.S. District Court for the Southern District of New York. Each of the Underwriter Defendants (defined below) are also either headquartered in this District or directed substantial conduct toward the State of New York in connection with undertaking the IPO, including conducting the roadshow in this District.

4.      In connection with the acts alleged in this complaint, defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including, but not limited to, the mails, interstate telephone communications and the facilities of the national securities markets.

## PARTIES

5.      Plaintiff Chao Lu purchased Jumei ADSs pursuant and/or traceable to the IPO, as set forth in the certification attached hereto and incorporated by reference herein, and was damaged thereby.

6.      Defendant Jumei operates as an online retailer of beauty products in the People's Republic of China. Following the IPO, Jumei ADSs trade on the NYSE under the ticker symbol "JMEI."

7.      Defendant Leo Ou Chen ("Chen"), Jumei's founder, is, and was at the time of the IPO, a member of the Jumei Board of Directors (the "Board"), the Chairman of the Board, a member of the Board's Audit Committee and Jumei's Chief Executive Officer ("CEO").

8.      Defendant Yusen Dai ("Dai") is, and was at the time of the IPO, Vice President of Products of Jumei and a member of its Board.

9.      Defendant Mona Meng Gao ("Gao") is, and was at the time of the IPO, a Co-Chief Financial Officer ("CFO") of Jumei.

10.     Defendant Yunsheng Zheng ("Zheng") is, and was at the time of the IPO, a Co-Chief Financial Officer ("CFO") of Jumei.

11.     Defendants Steve Yue Ji and Keyi Chen are, and were at the time of the IPO, members of the Jumei Board.

12.     The defendants named in ¶¶7-11 are sometimes referred to herein as the "Individual Defendants." The Individual Defendants each signed the Registration Statement issued in connection with the IPO.

13.     Defendants Goldman Sachs (Asia) L.L.C. ("Goldman Sachs"), Credit Suisse Securities (USA) LLC ("Credit Suisse"), J.P. Morgan Securities LLC ("JP Morgan"), China Renaissance Securities (Hong Kong) Limited ("China Renaissance"), Piper Jaffray & Co. and Oppenheimer & Co. Inc. (collectively the "Underwriter Defendants") are financial services firms that acted as underwriters of Jumei's IPO, with Goldman Sachs, Credit Suisse, JP Morgan and China Renaissance acting as co-lead managers of the IPO, and all helping to draft and disseminate the offering documents. Each of the Underwriter Defendants either maintains their principal place of business or executive offices in this District or directed substantial activities toward the State of New York in connection with conducting the IPO, including conducting the roadshow in this District.

14.     Pursuant to the Securities Act, the Underwriter Defendants are liable for the false and misleading statements in the Registration Statement as follows:

(a)     The Underwriter Defendants are investment banking houses that specialize, *inter alia*, in underwriting public offerings of securities. They served as the underwriters of the IPO and shared approximately $19.6 million in fees collectively. The Underwriter Defendants determined that in return for their share of the IPO proceeds, they were willing to merchandize Jumei ADSs in the IPO. The Underwriter Defendants arranged a multi-city roadshow prior to the IPO during which they, and representatives from Jumei, met with

potential investors and presented highly favorable information about the Company, its operations, and its financial prospects.

(b)     The Underwriter Defendants also demanded and obtained an agreement from Jumei that it would indemnify and hold them harmless from any liability under the federal securities laws. They also made certain that Jumei had purchased millions of dollars in directors' and officers' liability insurance.

(c)     Representatives of the Underwriter Defendants also assisted Jumei and the Individual Defendants in planning the IPO, and purportedly conducted an adequate and reasonable investigation into the business and operations of Jumei, an undertaking known as a "due diligence" investigation. The due diligence investigation was required of the Underwriter Defendants in order to engage in the IPO. During the course of their "due diligence," the Underwriter Defendants had continual access to confidential corporate information concerning Jumei's operations and financial prospects.

(d)     In addition to availing themselves of virtually unbridled access to internal corporate documents, agents of the Underwriter Defendants met with Jumei's lawyers, management, and top executives and engaged in "drafting sessions" between at least January 2014 and May 2014. During these sessions, understandings were reached as to: (i) the strategy to best accomplish the IPO; (ii) the terms of the IPO, including the price at which Jumei ADSs would be sold; (iii) the language to be used in the Registration Statement; (iv) what disclosures about Jumei would be made in the Registration Statement; and (v) what responses would be made to the SEC in connection with its review of the Registration Statement. As a result of those constant contacts and communications between the Underwriter Defendants'

representatives and Jumei management and top executives, the Underwriter Defendants knew, or should have known, of Jumei's existing problems as detailed herein.

(e)     The Underwriter Defendants caused the Registration Statement to be filed with the SEC and declared effective in connection with offers and sales thereof, including to plaintiff and the Class.

## SUBSTANTIVE ALLEGATIONS

15.     Defendant Chen founded Jumei in 2009.  Jumei sells various beauty products, including cosmetics, skin care and body care products, cosmetic applicators, and fragrance products, as well as beauty products for women, men and children.  It also offers apparel and other lifestyle products such as women's wear, lingerie, footwear, handbags and luggage, men's wear, sportswear and sporting goods, accessories, home goods and other lifestyle products, luxury goods, and baby, children and maternity products, as well as snacks and health supplements.

16.     The Company sells through its website Jumei.com, launched in March 2010, as well as through its mobile application launched in May 2012.

17.     The Company has two sales divisions based on how the product is sourced: (i) merchandise procured directly by Jumei from manufacturers (and sometimes from shopping malls) is sold through its Merchandise sales segment; and (ii) merchandise procured from third parties, with Jumei allowing those third parties to use its website to sell product to Jumei customers, is sold through its Marketplace services segment.  Jumei sells cosmetics and beauty products through both segments, but only sells apparel and other lifestyle products through the third-party Marketplace segment.  Revenues for sales through the two divisions are also calculated differently, with net revenues from Merchandise sales being gross sales less cost of revenues, and net revenues from Marketplace sales being the service fee Jumei receives from

third-party merchants for use of its Marketplace, including fees it charges for providing fulfillment and delivery services for Marketplace products that are fulfilled by Jumei's logistics centers. Jumei's gross margins from sales through its Marketplace are higher because there are no costs of revenue on those sales.

18.     During fiscal 2011, Jumei derived $18.5 million of its total of $21.8 million in sales through Marketplace sales, or 85%, and the remaining $3.3 million from Merchandise sales. In 2012, Jumei's Merchandise sales grew dramatically and Jumei derived $209 million of its $233.2 million in sales from Merchandise, or nearly 90%, and only 24.2 million – or roughly 10% – from its Marketplace. In 2013, Jumei derived $413 million of its $483 million in sales from Merchandise sales, or 85.5%, and the remaining $69.9 million – or 14.5% – in Marketplace sales. In the last full quarter before the IPO, Jumei derived $129.8 million of its $154.9 million in sales, or just 81.2%, from Merchandise sales and the remaining $25 million – or 16.1% – from Marketplace sales.

## THE CHINESE GOVERNMENT INCREASES SCRUTINY OF ONLINE MERCHANDIZERS JUST PRIOR TO THE IPO

19.     In May 2010, China's State Administration of Industry and Commerce ("SAIC") adopted the Interim Measures for the Administration of Online Commodities Trading and Relevant Services (the "2010 Measures"), which took effect in July 2010. Under the 2010 Measures, enterprises or other operators which engaged in online commodities trading and other services who were registered with the SAIC or its local branches needed only make the information stated in their business license available to the public or provide a link to their business license on their website. Online distributors were supposed to adopt measures to ensure safe online transactions, protect online shoppers' rights and prevent the sale of counterfeit goods.

Information on products and transactions released by online distributors was supposed to be authentic, accurate, complete and sufficient.

20.     The 2010 Measures were replaced by the Measures for the Administration of Online Commodities Trading (the "2014 Measures"), issued by the SAIC on January 26, 2014, which became effective on March 15, 2014, right before the IPO.  The newly issued 2014 Measures imposed much more stringent requirements and obligations on the online trading or service operators.  For example, customers were now entitled to return goods (except for certain fresh and perishable goods) which were purchased online within seven days upon receipt without any reason.  Where, as Jumei does, the online distributors also acts as a marketplace platform that provides service to third-party merchants, the online distributors now are obligated under the 2014 Measures to examine the legal status of all third-party merchants and make the information stated in the business licenses of such third-party merchants available to the public or provide a link to their business licenses on the website, as well as make a clear distinction between their online direct sales and sales of third-party merchant products on the marketplace platform.

21.     Meanwhile, the Chinese government also amended the PRC Consumer Protection Law on October 25, 2013, which amendment became effective on March 15, 2014, again, just prior to the IPO, which formally set out the obligations of business operators and the rights and interests of consumers.  Pursuant to this law, business operators must now guarantee that the commodities they sell satisfy the requirements for personal or property safety, provide consumers with authentic information about the commodities, and guarantee the quality, function, usage and term of validity of the commodities.  Failure to comply with the amended PRC Consumer Protection Law may subject business operators to civil liabilities such as refunding purchase prices, replacement of commodities, repairing, ceasing damages,

compensation, and restoring reputation, and even subject the business operators or the responsible individuals to criminal penalties when personal damages are involved or if the circumstances are severe.

22.     The amended PRC Consumer Protection Law further strengthened the protection of consumers by imposing more stringent requirements and obligations on business operators, especially on the business operators through the internet.  For example, consumers are now entitled to return goods purchased (except for certain specific goods) within seven days upon receipt without any reason when they purchase those goods from business operators via the internet.  Consumers whose interests are harmed due to their purchases of goods or acceptance of services on online marketplace platforms may now claim damages from sellers or service providers.

23.     As to legal liabilities of online marketplace platform providers like Jumei, the amended PRC Consumer Protection Law and the Regulations of Several Issues on the Application of Laws in the Trial of Food and Drugs Cases issued by the Supreme People's Court of the PRC on December 9, 2013 set forth that, where a consumer purchases products (including cosmetics and food) or accepts services via an online trading platform and his or her interests are prejudiced, if the online trading platform provider fails to provide the name, address and valid contact information of the seller, the manufacturer or the service provider, the consumer is entitled to demand compensation from the online trading platform provider.  If the online trading platform provider gives an undertaking that is more favorable to consumers, it shall perform such undertaking.  Once the online trading platform provider has paid compensation, it shall have a right of recourse against the seller, the manufacturer or the service provider.  If an online trading platform provider is aware or ought to have been aware that a seller, manufacturer or service

provider is using the online platform to infringe upon the lawful rights and interests of consumers and it fails to take necessary measures, it shall bear joint and several liabilities with the seller, the manufacturer or service provider for such infringement.

## THE FALSE AND MISLEADING REGISTRATION STATEMENT

24.     On or about January 30, 2014, Jumei filed confidential, draft Registration Statements on Form S-1 (Registration Nos. 333-195229 and 333-196001) (collectively, with the final Prospectus later filed, the "Registration Statement") with the SEC, which, following several amendments in response to comments by the SEC, would later be utilized for the IPO.  On May 15, 2014, at 5:00 p.m. ET, the SEC declared the Registration Statement effective.  On or about May 16, 2014, Jumei and the Underwriter Defendants priced the IPO and then filed the final Prospectus for the IPO, which forms part of the Registration Statement, with the SEC on May 16, 2014.

25.     The Registration Statement was negligently prepared and, as a result, contained untrue statements of material facts or omitted to state other facts necessary to make the statements made not misleading and was not prepared in accordance with the rules and regulations governing its preparation.

26.     Concerning the Company's compliance with the newly enacted 2014 Measures and the amended PRC Consumer Protection Law, the Registration Statement stated in pertinent part that Jumei was "currently in compliance with these regulations in all material aspects."

27.     The Registration Statement also stated that Jumei had "adopted measures to verify the authenticity of products sold on [its] internet platform and to immediately remove any counterfeit products found on [its] internet platform."

28.     Concerning the Company's purported then-present ability to ensure that Jumei.com was selling authentic cosmetics and other products, the Registration Statement stated

in pertinent part that its "internet platform [was] a *trusted destination* for consumers to discover and purchase *branded beauty products*, and fashionable apparel and other lifestyle products" and listed as one of the Company's top five strengths its "*trusted online retail brand* for beauty products."

29.     Emphasizing how the Company's purportedly wide variety of products available for sale enhanced its sales capabilities and business prospects, the Registration Statement stated in pertinent part that Jumei "sell[s] *a wider selection of branded beauty products* through [its] online shopping mall on a long-term basis to enhance customer stickiness" and that it had "built . . . *a wide variety of well-selected products*, which ha[d] been essential for [its] rapid growth."

30.     Though it disclosed that Jumei's "suppliers and third-party merchants include[d] brand owners, brand distributors, resellers and certain exclusive product suppliers" and that it "worked with approximately 1,700 suppliers and third-party merchants in 2013," the Registration Statement failed to disclose that certain of those "third-party merchants" were actually unauthorized "brand distributors" and/or "resellers" who Jumei could not continue to do business with once it became a publicly traded company.

31.     The Registration Statement attributed Jumei's past financial successes, *i.e.*, increasing profits from a net loss of $4 million in 2011 on $21.8 million in net revenues, to a net income of $8.1 million in 2012 on $233.2 million in net revenues, to a net income of $25 million in 2013 on net revenues of $483.0 million, to the following claims of strong business acumen without disclosing that the Company's prior profit growth was actually achieved, in part, due to purchasing counterfeit or fake product and knockoffs from dubious third-party distributors and resellers, which Jumei then sold at premium prices:

Our visionary management team has the foresight to identify and meet evolving customer needs and market opportunities in the beauty products market. Under our management's leadership, we have attracted a large and loyal user base through our creative and cost-efficient marketing campaigns as well as word-of-mouth referrals *resulting from our well-selected products and superior customer experience*. We further enhance the attractiveness of our product offerings by entering into arrangements with beauty product suppliers for exclusive sales and distribution of selected products in China. *We implement effective measures to control costs and operating expenses, which have enabled us to achieve and increase operating profitability*.

32.     Citing a Frost & Sullivan report, the Registration Statement also touted the strong "steady" growth in China's beauty products industry and the rapid growth in online sales in recent years, without disclosing – as Jumei's management would concede on July 2, 2014 in a "Business Update" – that in reality the Chinese internet beauty products industry was rife with counterfeit and fake product offerings and knockoffs that threatened the nascent industry by damaging the reputation of Chinese internet sellers like Jumei.

33.     The Registration Statement listed the Company's top six "Strategies" as including: "extend[ing] our product offerings," "strengthen[ing] our mobile platform," "improv[ing] customer experience and enhanc[ing] customer loyalty," "increas[ing] our brand recognition," "extend[ing] our operational capabilities," and "pursu[ing] strategic alliances, investments and acquisition opportunities," *without disclosing as Jumei's management would in its July 2, 2014 "Business Update" the Company's plan to essentially eliminate all Marketplace sales from its business model, i.e., the sale of unverified and potentially unauthorized product by third-party merchants and resellers through the Jumei.com website – sales that made up approximately 30% of Jumei's sales pre-IPO, in favor of only selling authentic products from brand-authorized sources*.

34.     The Registration Statement also failed to disclose as a "Strategy" that Jumei was then in the process of spending tens of thousands of dollars purchasing special testing equipment

that would permit Jumei to verify product authorization and authenticity in-house, as required by the newly enacted 2014 Measures and the amended PRC Consumer Protection Law, and that as a result of the Company's elimination of dubious third-party merchants and resellers from its Marketplace, the Company would be forced to offer significant cash incentives to dump a lot of dubious inventory and that at least on temporary basis, the Company's sales would be hampered by a reduced product selection as less credible suppliers were removed from its supply network. The Registration Statement also failed to disclose that removing these less credible suppliers from its supply network would increase Jumei's product costs going forward, reducing the high gross margins the Company had previously been able to achieve pre-IPO through sales of less legitimately sourced product.

35.   The statements referenced above in ¶¶26-34 were inaccurate statements of material fact because they failed to disclose the following material facts that existed at the time of the IPO:

(a)   Jumei's pre-IPO sales growth and profits had been driven in part by allowing third-party vendors to sell counterfeit and fake products and knock-offs at below-market prices through its Marketplace;

(b)   Jumei had a substantive level of dubiously sourced, third-party inventory that would have to be dumped once the Company became publicly traded;

(c)   Jumei had a sizable number of dubious third-party product suppliers that it would have to cease doing business with once it became a publicly traded company, which would both increase its costs of goods and, at least temporarily, decrease its sales by reducing the variety of product the Company had to sell as it sought out more legitimate product sources;

(d)     Jumei did not own the required testing equipment to demonstrate that it was capable of ferreting out counterfeit and/or fake products and knockoffs from its suppliers, as required by the newly enacted 2014 Measures and the amended PRC Consumer Protection Law, and would be forced to spend tens of thousands of dollars developing such capabilities once it became a publicly traded company;

(e)     Jumei's management was offering coupons that were significantly discounting the prices being paid for its products in order to increase demand and sales;

(f)     as a result of the discounting sales through coupons, Jumei's gross margins were significantly declining; and

(g)     as a result of the foregoing, the Company was not on track to achieve the financial results defendants had led the market to believe Jumei was on track to achieve in the Registration Statement.

36.     Under the rules and regulations governing the preparation of the Registration Statement, Jumei was required to disclose at the time of the IPO that it had been relying upon dubious suppliers for its third-party "Marketplace" offerings that it needed to cease doing business with and that ceasing to do business with those suppliers would raise its product costs and would, at least temporarily, diminish its sales by decreasing the variety of product the Company had to offer.  The Registration Statement, however, contained no such disclosures. Pursuant to Item 303 of Regulation S-K [17 C.F.R. §229.303], and the SEC's related interpretive releases thereto, issuers are required to disclose events or uncertainties, including any known trends, that have caused, or are reasonably likely to cause, the registrant's financial information not to be indicative of future operating results.  At the time of the IPO, the adverse events and uncertainties associated with the trends described above were reasonably likely to have a

material impact on Jumei's profitability and, therefore, were required to be disclosed in the Registration Statement.

37.     The IPO was successful for the Company and the Underwriter Defendants, with Jumei issuing and selling more than 12.7 million ADSs of Jumei to the public at $22 each, raising approximately $280 million in gross proceeds ($260.3 million in net proceeds after deducting underwriting discounts, commissions and offering costs).



*CEO Leo Ou Chen of Jumei.com, third from right, is joined in applause as he rings the New York Stock Exchange opening bell, marking his company's IPO, Friday, May 16, 2014. The Beijing, China-based online beauty retailer, Jumei.com, s China's No. 1 online retailer of beauty products as measured by gross merchandise volume. (AP Photo/Richard Drew)*

38.     Following the Company's issuance of a July 2014 "Business Update" outlining a series of steps the Company would need to take to ensure the legitimacy of the product being sold on its website going forward, including the purchase of expensive testing equipment, and the Company's reporting of its actual third quarter 2014 financial results (for the period ended September 30, 2014) that were negatively impacted by the business model changes described in

the Business Update, on November 19, 2014, *Barron's* published the following report entitled

"Why Jumei's Business Model is Broken. Selling Authentic Makeup Is Costly," which disclosed

in pertinent part as follows:

> China's largest online discount beauty products seller Jumei (JMEI) went public in New York in May at an IPO price of $22 per share. After a strong performance to high of $34 in late August, this stock has been in a nosedive closing at $22.23 on Wednesday, just about where it started.

> Jumei's third-quarter earnings were disappointing. Total gross merchandize value (GMV) grew by only 31.4% from a year ago to $273 million, the slowest year-on-year growth on record. In 2013, Jumei's GMV rose by 150%.

> Margins also fell. Gross profit margin decreased to 22% from 25.9% a year ago.

> ### What happened?

> *Investors are worried that as an online discounter, Jumei can't control its sourcing and inevitably sells counterfeit products. About 30% of Jumei's GMV came from third-party merchants last year and most of Jumei's tier-one brands such as Estee Lauder, Lancome and Clinique were sold by these third-party merchants who relied on parallel importing to make money. By not controlling the sourcing directly, Jumei runs the risk of selling fake products on its site.*

> *As a result, Jumei has decided to rapidly shift the sale of all beauty products from its third-party marketplace to direct sales. But this affects Jumei's near-term results. According to HSBC analyst Chi Tsang and team, this strategic shift "reduced the supply of products being offered," which negatively affected GMV. Margin was also affected because "management has been offering coupons to drive demand." In Jumei's third-quarter press release, the company blamed its lower gross profit margin on an "increase in promotional activities."*

39.     At the time of the filing of this action, Jumei ADSs are trading below $14 each,

*an approximately 38% decline from the IPO price.*

## CLASS ACTION ALLEGATIONS

40.     Plaintiff brings this action as a class action on behalf of all those who purchased

Jumei ADSs pursuant and/or traceable to the Registration Statement issued in connection with

the IPO (the "Class"). Excluded from the Class are defendants and their families, the officers and directors and affiliates of defendants, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

41.     The members of the Class are so numerous that joinder of all members is impracticable. While the exact number of Class members is unknown to plaintiff at this time and can only be ascertained through appropriate discovery, plaintiff believes that there are hundreds of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by Jumei or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

42.     Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by defendants' wrongful conduct in violation of federal law that is complained of herein.

43.     Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

44.     Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)     whether defendants violated the Securities Act;

(b)     whether the Registration Statement was negligently prepared and contained inaccurate statements of material fact and omitted material information required to be stated therein; and

- 16 -

(c)     to what extent the members of the Class have sustained damages and the proper measure of damages.

45.     A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## COUNT I

### For Violation of §11 of the Securities Act
### Against All Defendants

46.     Plaintiff incorporates ¶¶1-45 by reference.

47.     This Count is brought pursuant to §11 of the Securities Act, 15 U.S.C. §77k, on behalf of the Class, against all defendants.

48.     The Registration Statement for the IPO was inaccurate and misleading, contained untrue statements of material facts, omitted to state other facts necessary to make the statements made not misleading, and omitted to state material facts required to be stated therein.

49.     Defendants are strictly liable to plaintiff and the Class for the misstatements and omissions.

50.     None of the defendants named herein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Registration Statement were true and without omissions of any material facts and were not misleading.

51.     By reason of the conduct herein alleged, each defendant violated, and/or controlled a person who violated, §11 of the Securities Act.

- 17 -

52.     Plaintiff acquired Jumei ADSs traceable to the IPO.

53.     Plaintiff and the Class have sustained damages.  The value of Jumei ADSs has declined substantially subsequent to and due to defendants' violations.

54.     At the time of their purchases of Jumei ADSs, plaintiff and other members of the Class were without knowledge of the facts concerning the wrongful conduct alleged herein and could not have reasonably discovered those facts prior to the disclosures herein.  Less than one year has elapsed from the time that plaintiff discovered or reasonably could have discovered the facts upon which this complaint is based to the time that plaintiff commenced this action.  Less than three years has elapsed between the time that the securities upon which this Count is brought were offered to the public and the time plaintiff commenced this action.

## COUNT II

### For Violation of §15 of the Securities Act
### Against Jumei and the Individual Defendants

55.     Plaintiff incorporates ¶¶1-54 by reference.

56.     This Count is brought pursuant to §15 of the Securities Act, 15 U.S.C. §77o, against Jumei and the Individual Defendants.

57.     The Individual Defendants each were control persons of Jumei by virtue of their positions as directors and/or senior officers of Jumei.  The Individual Defendants each had a series of direct and/or indirect business and/or personal relationships with other directors and/or officers and/or major shareholders of Jumei.  The Company controlled the Individual Defendants and all of Jumei's employees.

58.     The Individual Defendants were each culpable participants in the violations of §11 of the Securities Act alleged in Count I above, based on their having signed or authorized the signing of the Registration Statement and having otherwise participated in the process which

- 18 -

allowed the IPO to be successfully completed. Jumei was a culpable participant in the violations of §11 of the Securities Act alleged in Count I above, based on its control of the Individual Defendants and having otherwise participated in the process which allowed the IPO to be successfully completed.

## PRAYER FOR RELIEF

WHEREFORE, plaintiff prays for relief and judgment as follows:

A.     Determining that this action is a proper class action, designating plaintiff as Lead Plaintiff and certifying plaintiff as a Class representative under Rule 23 of the Federal Rules of Civil Procedure and plaintiff's counsel as Lead Counsel;

B.     Awarding compensatory damages in favor of plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

C.     Awarding plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees;

D.     Awarding rescission or a rescissory measure of damages; and

E.     Such equitable/injunctive or other relief as deemed appropriate by the Court.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

DATED: December 11, 2014                    ROBBINS GELLER RUDMAN
                                            & DOWD LLP
                                            SAMUEL H. RUDMAN
                                            MARY K. BLASY

                                            SAMUEL H. RUDMAN

58 South Service Road, Suite 200
Melville, NY  11747
Telephone:  631/367-7100
631/367-1173 (fax)
srudman@rgrdlaw.com
mblasy@rgrdlaw.com

JOHNSON & WEAVER, LLP
FRANK J. JOHNSON
110 West "A" Street, Suite 750
San Diego, CA  92101
Telephone:  619/230-0063
619/255-1856 (fax)
frankj@johnsonandweaver.com

JOHNSON & WEAVER, LLP
W. SCOTT HOLLEMAN
99 Madison Avenue, 5th Floor
New York, NY  10016
Telephone:  212/802-1486
212/602-1592 (fax)
scotth@johnsonandweaver.com

Attorneys for Plaintiff

## CERTIFICATION OF PLAINTIFF PURSUANT
## TO THE FEDERAL SECURITIES LAWS

I, Chao Lu, declare the following as to the claims asserted, or to be asserted, under the federal securities laws:

1.  I have reviewed the complaint and authorize its filing.

2.  I did not acquire the securities that are the subject of this action at the direction of plaintiff's counsel or in order to participate in any private action or any other litigation under the federal securities laws.

3.  I am willing to serve as a representative party on behalf of the class, including testifying at deposition or trial, if necessary.

4.  I made the following transactions during the Class Period in the securities that are the subject of this action.

**Acquisitions:**

| Date Acquired | Number of Shares Acquired | Acquisition Price Per Share |
|---|---|---|
| 100 | 09/09/14 | 27.50 |
| 100 | 9/3/2014 | 30.28 |
| 50 | 9/3/2014 | 29.23 |

**Sales:**

| Date Sold | Number of Shares Sold | Selling Price Per Share |
|---|---|---|
| | | |
| | | |

5.  I will not accept any payment for serving as a representative party beyond my pro-rata share of any recovery, except reasonable costs and expenses – such as lost wages and travel expenses – directly related to the class representation, as ordered or approved by the Court pursuant to law.

6.    I have not sought to serve or served as a representative party for a class in an action under the federal securities laws within the past three years, except if detailed below:

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 10th day of December, 2014.

DocuSigned by:

7346CB4A3ACC43B...

Chao Lu