UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------ :
                                           :
*IN RE* JUMEI INTERNATIONAL               :        14cv9826
HOLDING LIMITED SECURITIES                 :
LITIGATION                                 :        OPINION AND ORDER
                                           :
------------------------------------------ :

WILLIAM H. PAULEY III, District Judge:

Defendants Jumei International Holding Ltd. ("Jumei") and the Underwriter

Defendants—Goldman Sachs (Asia) LLC, Credit Suisse Securities LLC, J.P. Morgan Securities

LLC, China Renaissance Securities (Hong Kong) Ltd., Piper Jaffray & Co., and Oppenheimer &

Co., Inc.[1]—move to dismiss the Consolidated Amended Complaint ("Complaint") in this

securities class action.  The putative class, consisting of investors in Jumei's American

Depository Shares ("ADS"), brings this suit under Sections 10(b) and 20(a) of the Exchange Act

and Sections 11 and 15 of the Securities Act.  For the following reasons, Defendants' motion is

granted and the Complaint is dismissed.

BACKGROUND

This action arises from Jumei's May 16, 2014 initial public offering of ADS on

the New York Stock Exchange.  Jumei is a Chinese online retailer specializing in beauty

products and apparel.  Plaintiffs claim that the IPO registration statement (the "Registration

Statement") and a subsequent earnings report contained materially false and misleading

statements because they failed to disclose Jumei's plan to wind down its third-party beauty

---

[1] The Complaint also names six executives of Jumei in their individual capacities (the "Individual Defendants").
These Defendants, all Chinese nationals, have not yet been served in this action.  Counsel for Plaintiffs represents
that Hague Convention service requests are currently pending in China as to all six Individual Defendants (see ECF
No. 100).

supply marketplace in September 2014, a decision that precipitated a sharp decline in Jumei's share price.

Jumei generates revenue through two primary channels: merchandise sales and marketplace sales.  Merchandise sales consist of private-label Jumei brands sold directly by Jumei to consumers through its online platform.  Marketplace sales occur on Jumei's online marketplace, where third-party merchants offer products to Jumei's customers in exchange for a service fee, payable to Jumei.  In 2013, marketplace sales accounted for 14.5% of Jumei's net revenue, and nearly 50% of those sales were of beauty products.  (Compl. ¶ 50.)  By the end of the first quarter of 2014, the revenue attributable to marketplace sales had risen to 16%, and the marketplace generated 57% of Jumei's gross merchandise volume, a measure of the total value of retail sales.  (Compl. ¶ 50, 60.)  These sales were particularly profitable because, as Jumei pointed out in the Registration Statement, the company does not incur costs of revenue for third-party sales.  (Compl. ¶ 50.)

Like any online-marketplace provider, Jumei is responsible for detecting and removing counterfeit merchandise offered by third-party sellers.  In the Registration Statement, Jumei dedicated a portion of the "Risk Factors" section to this issue, noting that "[i]f counterfeit products are sold on our internet platform, our reputation and financial results could be materially and adversely affected."  (Declaration of Scott D. Musoff ("Musoff Decl."), ECF No. 89, Ex. B at 23.)  The Registration Statement disclosed that "[a]lthough we have adopted measures to verify the authenticity of products sold on our internet platform and to immediately remove any counterfeit products . . . these measures may not always be successful."  (Musoff Decl., Ex. B at 23.)  Jumei further warned potential investors that "[t]he discovery of counterfeit products sold on our internet platform may sever[ely] damage our reputation and cause

customers to refrain from making future purchases from us, which would materially and adversely affect our business operations and financial results." (Musoff Decl., Ex. B at 23.)

On May 15, 2014 Jumei completed its IPO, selling more than 11 million shares at $22/share for a capital raise of $245 million. The share price jumped as high as $28.28 on the first day of trading and peaked at $39.45 on August 18, the day that Jumei released its second-quarter results and year-end forecast. In that filing, Jumei reported an increase in net income and gross merchandise volume, but a slight decrease in gross profit margins. (Compl. ¶ 54.) Jumei executives held an earnings call the following day, lauding the company's strong growth and emphasizing its commitment to expanding its exclusive and private-label beauty products offering. (Comp. ¶ 57.) Jumei also stressed that it was "committed to enhancing [its] supply chain management and implementing strict quality control measures . . . in order to reinforce Jumei's reputation for quality and reliability." (Compl. ¶ 58.)

Sometime in September 2014,[2] Jumei moved its beauty-products business out of the marketplace and focused instead on its private-label merchandise offerings. (Compl. ¶ 68.) The stock price fell sharply, declining by 40% between August 18 and November 12, when shares traded at $24.19. (Compl. ¶ 64.) In its third-quarter 2014 earnings report on November 18, Jumei disclosed a 4% decline in gross profit margins "attribut[able] to the shift of high margin 'beauty product marketplace sales' to much lower margin 'merchandise sales,'" as well as the one-off promotional discounts that Jumei had to offer on marketplace products in order to effect that shift. (Compl. ¶ 66.) Jumei explained that its sudden exit from the profitable

---

[2] The Complaint does not allege exactly when this shift occurred. Plaintiffs rely on a statement by a Jumei executive in November 2014 that Jumei "started the shift in September, so prior to September we had around 30% of our beauty products in marketplace . . . [and] we made the move quite swiftly so in September there was only a single digit percent of our beauty products in marketplace." (Compl. ¶ 68.)

marketplace channel would ensure "greater control over the entire beauty supply chain and . . . strengthen our quality control [against counterfeit products]."  (Compl. ¶ 67.)  By November 21, 2014, Jumei shares were trading at $18.13; this suit followed several weeks later.

## LEGAL STANDARD

To survive a motion to dismiss, a complaint "must plead 'enough facts to state a claim for relief that is plausible on its face.'"  Patane v. Clark, 508 F.3d 106, 111–12 (2d Cir. 2007) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 127 S.Ct. 1955, 1964–65 (2007)). The Court must accept all material facts alleged in the complaint as true and construe all reasonable inferences in favor of the plaintiff.  Grandon v. Merrill Lynch & Co., 147 F.3d 184, 188 (2d Cir. 1998).  However, a plaintiff must still offer "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action" to avoid dismissal.  Twombly, 127 S.Ct. at 1964–65.  "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (citation omitted).

## DISCUSSION

I.      **Securities Act Claims**

Section 11 of the Securities Act "create[s] liability for material misstatements or omissions in connection with the initial sale and distribution of securities."  In re Fuwei Films Sec. Litig., 634 F. Supp. 2d 419, 434 (S.D.N.Y. 2009).  "A successful section 11 claim requires that: (1) the defendant have an affirmative duty to disclose the information but fails to do so, and (2) the untrue or omitted information was material."  In re Agria Corp. Sec. Litig., 672 F. Supp. 2d 520, 525 (S.D.N.Y. 2009).  Here, Plaintiffs claim that the Registration Statement was inaccurate and misleading because Jumei's impending exit from the third-party beauty supplies

marketplace was known to Jumei and "reasonably likely to have a material impact on Jumei's profitability and, therefore, [was] required to be disclosed . . . pursuant to Item 303 of Regulation S-K." (Compl. ¶ 108.)

Defendants move to dismiss the Securities Act claims on two theories. First, Defendants argue that the § 11 claims sound in fraud and thus are subject to the heightened pleading standard of FRCP 9(b). In the alternative, Defendants maintain that these claims fail even under the less-stringent FRCP 8 pleading rules, as Plaintiffs have failed to allege an actionable misrepresentation or omission.

     i.    Pleading Standard

To determine the appropriate pleading standard in a § 11 case, the court must "'conduct a preliminary inquiry into whether plaintiffs' allegations are premised on fraud,' or merely on negligence." City of Pontiac Policeman's and Fireman's Retirement Sys. v. UBS AG, 752 F.3d 173, 183 (2d Cir. 2014) (quoting In re Lehman Bros. Mortgage-Backed Sec. Litig., 650 F.3D 167, 174 (2d Cir. 2011)). Although Plaintiffs "need allege no more than negligence to proceed under Section 11 . . . claims that do rely upon averments of fraud are subject to the test of Rule 9(b)." Rombach v. Chang, 355 F.3d 164, 171 (2d Cir. 2004). Courts should "look to the allegations of the Complaint to determine whether plaintiffs' Securities Act claims sound in fraud." In re Ultrafem Inc. Sec. Litig., 91 F. Supp. 2d 677, 690 (S.D.N.Y. 2000); see also In re Refco, Inc. Sec. Litig., 530 F. Supp. 2d 611, 632 (S.D.N.Y. 2007) ("Rombach necessarily requires a case-by-case analysis of particular pleadings to determine whether the gravamen of the complaint is plainly fraud.")

Defendants argue that Rule 9(b) should apply here because the Complaint alleges the same facts in support of the Securities Act claims as it does for the Exchange Act claims,

which are fraud counts subject to Rule 9(b).  According to Defendants, the Complaint invokes

Rule 9(b) by employing certain phrases—such as "inaccurate and misleading" or "untrue

statements of material facts"—that are "classically associated with fraud."  Rombach, 355 F.3d

at 172.  However, it cannot be the case that the use of this language (which appears in the text of

§ 11) automatically triggers the heightened pleading standard.  See In re Refco, 503 F. Supp. 2d

at 632 ("It is clear that the Second Circuit did not intend Rombach as an instruction that all § 11

pleadings should be subjected to the Rule 9(b) standard . . . the [Rombach] court's conclusion

should be read in the context of the pleadings at issue in that case.").  Instead, the rule that has

emerged is that plaintiffs "may plead Section 10(b) fraud and Section 11 negligence claims as

alternatives, as long as the complaint is organized in a way that allows the court to determine

which allegations support which claim."  Wallace v. IntraLinks, No. 11-CV-8861, 2013 WL

1907685, at *11 (S.D.N.Y. May 8, 2013); see also In re IAC/InterActiveCorp Sec. Litig., 695 F.

Supp. 2d 109, 116 (S.D.N.Y. 2010) ("What is foreclosed is pleading fraud and non-fraud claims

in the alternative so poorly that the court is unable to figure out which allegations are intended to

support which claims.")

        Plaintiffs demarcate the § 11 claims as "in effect a separate complaint" for which

"there is no allegation of fraud, scienter or recklessness."  (Compl. ¶ 105.)  The Complaint

further clarifies that the Securities Act claims "expressly do not make any allegations of fraud or

scienter" and do not incorporate the facts alleged in ¶¶ 54–61 (the second-quarter 2014 earnings

report) or 87–104 (the Exchange Act claims).  (Compl. ¶ 105.)  A complaint "cannot evade the

Rule 9(b) strictures by summarily disclaiming any reliance on a theory of fraud or recklessness."

In re JP Morgan Chase Sec. Litig., 363 F. Supp. 2d 595, 635 (S.D.N.Y. 2005).  Here, however,

Plaintiffs have sufficiently compartmentalized the claims into two discrete theories—negligence

under the Securities Act, and fraud under the Exchange Act, with specified factual allegations supporting each.  See In re Refco, 503 F. Supp. 2d at 632 (declining to apply Rule 9(b) where plaintiff's "careful division [of the claims] makes it easy to distinguish between the two, and the substance of the allegations keeps the distinction as clear as does the complaint's structure"). Accordingly, the notice-pleading standard of Rule 8 applies to Plaintiffs' Securities Act claims.

       ii.      Actionable Misstatement or Omission

          Plaintiffs allege that the Registration Statement was false and misleading because Jumei did not disclose its plans to exit the third-party beauty supplies marketplace in September 2014, a disclosure that Plaintiffs believe was required under Item 303 of Regulation S-K. (Compl. ¶ 108.)  Item 303 requires registrants to describe "any known material trends that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."  17 C.F.R. § 229.303(a)(3)(ii). This disclosure duty exists "where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation."  Certain Investment Company Disclosures, Exchange Act Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989).  A plaintiff relying on Item 303 to establish a § 11 claim must "plead, with some specificity, facts establishing that defendant had actual knowledge of the purported trend."  Blackmoss Investments Inc. v. ACA Capital Holdings, Inc., No. 07-CV-10528, 2010 WL 148617, at *9 (S.D.N.Y. Jan. 14, 2010).

          The thrust of Plaintiffs' argument is that "it is inconceivable that the [exit plan] was hatched overnight" due to the "scope and impact" of third-party beauty product sales on Jumei's business.  (Opposition Brief ("Opp."), ECF No. 94 at 23–24.)  Plaintiffs insist that it can be "plausibly inferred that the plan was conceived prior to the IPO and . . . [would] adversely

impact Jumei's financial condition."  (Opp. at 24.)  The Complaint sets forth no facts, however,

to support that inference—i.e. that any Defendant knew about the exit plan and its likely impact

on the business a full four months before the exit occurred.[3]  Courts have previously rejected

similar efforts to "ask the Court to assume that Defendants must have known because something

did in fact occur later" as "simply inadequate pleading."  Panther Partners, Inc. v. Ikanos

Comm's, Inc., 538 F. Supp. 2d 662, 673 (S.D.N.Y. 2008); see also Medina v. Tremor Video,

Inc., No 13-CV-8364, 2015 WL 1000011, at *3 (S.D.N.Y. March 5, 2015) ("Plaintiffs also argue

that the Court can infer Defendants' knowledge in June 2013 because four months later the trend

was used to explain the loss . . . But knowledge on day-120 does not mean Defendants "knew" or

"must have known" on day-1.")

             Plaintiffs would have a stronger argument if they were claiming that Defendants

had concealed the counterfeit-products issue prior to the IPO, as this was the actual "trend" or

"uncertainty" that ultimately forced Jumei to wind down its beauty-products marketplace.

However, Plaintiffs cannot bring that claim because Defendants disclosed those risks at length in

the Registration Statement.  (See Musoff Decl., Ex. B at 20–23.)  Plaintiffs cite to Litwin v.

Blackstone Group, L.P., in which the Second Circuit held that the complaint "allege[d] that the

downward trend in the real estate market was already known and existing at the time of the IPO"

and that Blackstone was heavily exposed to that sector, thereby creating an Item 303 disclosure

obligation.  634 F.3d 706, 716 (2d Cir. 2011).  This comparison underscores the deficiencies in

the Complaint, which contains no allegations that Defendants knew of the impending exit from

---

[3] Plaintiffs allege in their Opposition Brief that after the IPO, one Individual Defendant disclosed that "the exit strategy was discussed during the IPO road shows."  (Opp. at 20.)  This allegation does not appear in the Complaint and will not be considered on this motion.  See Playboy Enters., Inc. v. Dumas, 960 F. Supp. 710, 720 (S.D.N.Y. 1997) (a court need not consider arguments raised for the first time in a reply brief).

the beauty-supplies marketplace at the time of the IPO, much less the probable effect of that exit on Jumei's share price.  Defendants were obligated to disclose the risk of counterfeit products on Jumei's marketplace (which they did), but Plaintiffs have alleged no facts showing that any Defendant knew in May 2014 that the company would exit the third-party marketplace in September due to that same risk.  Because Plaintiffs have failed to allege an actionable misstatement or omission, the Securities Act claims are dismissed.

    II.       **Exchange Act Claims**

          "To state a cause of action under section 10(b) and Rule 10b-5, a plaintiff must plead that the defendant made a false statement or omitted a material fact, with scienter, and that plaintiff's reliance on defendant's action caused plaintiff's injury."  San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., 75 F.3d 801, 808 (2d Cir. 1996).  Fraud claims are subject to two heightened pleading standards: they must satisfy both FRCP 9(b) and the PSLRA's pleading requirements.  See ATSI Comm's, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 99, (2d Cir. 2007).  Under Rule 9(b), "the circumstances constituting fraud . . . shall be stated with particularity."  Fed. R. Civ. P. 9(b).  This requires a securities-fraud plaintiff to "(1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  Novak v. Kasaks, 216 F.3d 300, 306 (2d Cir. 2000).  When pleading scienter under the PSLRA, "the complaint shall, with respect to each act or omission alleged to violate [§ 10(b)], state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind."  15 U.S.C. § 78u-4(b)(2).  "The plaintiff may satisfy this requirement by alleging facts (1) showing that the defendants both had motive and opportunity to commit the fraud or (2)

constituting strong circumstantial evidence of conscious misbehavior or recklessness."  <u>ATSI</u>

<u>Comm's</u>, 493 F.3d at 89.

      When, as here,[4] a plaintiff does not allege motive, "it is still possible to plead

scienter by identifying circumstances indicating conscious behavior by the defendant, though the

strength of the circumstantial allegations must be correspondingly greater."  <u>Beck v. Mfrs.</u>

<u>Hanover Trust Co.</u>, 820 F.2d 46, 50 (2d Cir. 1987).  Instead, Plaintiffs contend that "Jumei's

knowledge can be inferred, because implementation of the Company's exit strategy affected

multiple facets of the Company's business . . . thereby necessitating advance planning before

execution."  (Opp. at 28.)  This is classic fraud-by-hindsight pleading.  Plaintiffs ask this Court to

assume knowledge and fraudulent intent on August 18, 2014 simply because Jumei began its exit

from the third-party marketplace several weeks later.  Absent other allegations, however, such an

inference cannot constitute "strong circumstantial evidence of conscious misbehavior"—"[t]o

rule otherwise would be to conclude that the scienter element is satisfied whenever a change of

mind closely follows a statement of intent."  <u>Faulkner v. Verizon Comm's, Inc.</u>, 156 F. Supp. 2d

384, 396 (S.D.N.Y. 2001).

      Ultimately, the Exchange Act claims fail for the same reasons as the Securities

Act claims: Plaintiffs have not pled any facts that raise the inference above a speculative level as

to any Defendant's knowledge or intent regarding Jumei's plans to exit the third-party

---

[4] Plaintiffs did not address Defendants' argument that the Complaint fails to plead motive, and thus concede that point.  <u>See</u> <u>In re UBS AG Sec. Litig.</u>, No. 07-CV-11225, 2012 WL 4471265, at *11 (S.D.N.Y. Sept. 28, 2012) (arguments not addressed in opposition brief are conceded).  Even if Plaintiffs had not conceded this point, however, the Complaint alleges no motive besides the desire to "inflate and maintain the market price of Jumei's securities," (Compl. ¶ 89.), which is insufficient to plead motive.  <u>See</u> <u>S. Cherry St., LLC v. Hennessee Grp. LLC</u>, 573 F.3d 98, 109 (2d Cir. 2009) ("[I]n attempting to show that a defendant had fraudulent intent, it is not sufficient to allege goals that are possessed by virtually all corporate insiders, such as . . . the desire to maintain a high stock price in order to increase executive compensation.") (internal citations omitted).

marketplace business.  Jumei consistently disclosed the risk of counterfeit products on its
marketplace platform and ultimately made a business decision that had a negative effect on its
share price.  The company was not obligated to disclose every potential response it may have
been considering to address the counterfeiting problem, and Plaintiffs have not pled any facts
suggesting that the decision to wind down the marketplace had been made by August 18, 2014.
See In re Cosi, Inc. Sec. Litig., 379 F. Supp. 2d 580, 587 (S.D.N.Y. 2005) (dismissing for failure
to plead scienter where plaintiffs alleged "only that Cosi had researched the possibility of
franchising for two months before the Prospectus was issued, and [did] not allege that a
franchising plan had been submitted to or approved by the board, or that any affirmative steps
had been taken to implement a franchising plan").  Indeed, Plaintiffs point to no evidence other
than the temporal proximity between the positive financial forecasts and Jumei's exit from the
marketplace business.  This is not sufficient to meet either the Rule 9(b) or PSLRA pleading
standard.  The Exchange Act claims are dismissed.[5]

---

[5] The remaining counts are control-person liability allegations against the Individual Defendants under § 15 of the
Securities Act and § 20(a) of the Exchange Act.  Because control-person liability is predicated on an underlying
primary violation, dismissal of the § 11 and § 10(b) claims also results in dismissal of the control-person counts.
See Rombach v. Chang, 355 F.3d 164, 177–78 (2d Cir. 2004) (control-person liability under § 15 requires a primary
violation of the Securities Act); ATSI Comm's, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 108 (2d Cir. 2007) (same,
with respect to § 20(a) claims and the Exchange Act).

<u>CONCLUSION</u>

For the foregoing reasons, Defendant's motion is granted and the Complaint is dismissed.  The Clerk of Court is directed to close the motion pending at ECF No. 87 and mark this case as closed.


Dated: January 10, 2017
       New York, New York

                                    SO ORDERED:


                                    _____
                                    WILLIAM H. PAULEY III
                                              U.S.D.J.